SUPERIOR COURT 
 
 DANA STRAYTON & another[1] vs. MARTHA’S VINEYARD COMMISSION &others[2]

 
 Docket:
 2018-8
 
 
 Dates:
 March 23, 2021
 
 
 Present:
 Paul D. Wilson, Justice of the Superior Court
 
 
 County:
 DUKES, ss.
 

 
 Keywords:
 FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT
 
 

             Plaintiffs Dana and Robert Strayton own property on Chappaquiddick Island, in the Town of Edgartown. On the nearby property of Defendant Robert Fynbo, Defendant New
Cingular Wireless PCS, LLC (“AT&T”)[3] has constructed a cell phone tower (the “Tower”). As one step in its permitting process for the Tower, AT&T obtained a favorable decision from Defendant Martha’s Vineyard Commission (the “MVC”). This lawsuit is an appeal from that decision of the MVC.
            The parties tried the case before me, without a jury, on October 26, 27 and 28 and December 14, 2020.[4] We began the second day of the trial by taking a view of Plaintiffs’ property, Defendant Fynbo’s nearby property where the Tower is located, and two alternative sites that AT&T had considered.
 
---------------------------
 
[1]Robert Strayton
 
2 New Cingular Wireless PCS, LLC; MVWIFI, LLC; and Robert Fynbo
 
[3]Although Defendant New Cingular Wireless PCS, LLC was the cell phone carrier that filed the application that ultimately led to this lawsuit, at trial all parties referred to that carrier as “AT&T,” perhaps, I infer, because of a later corporate merger. I will do so as well.
 
[4]The first three trial days were conducted mostly in person (although some witnesses testified virtually) in the courtroom of Dukes Superior Court, which was made as safe as possible during a time of pandemic. Because commitments of trial counsel prevented a fourth consecutive day of trial in Dukes Superior Court, with the consent of all parties the fourth day of evidence and the later closing arguments were held virtually, with me being in virtual courtrooms in other Superior Courts.
 
                                                            -1-
 
            Ten witnesses testified. Two of them were parties to this lawsuit: Plaintiff Dana Strayton and Defendant Robert Fynbo. Three of them were public officials: MVC Senior Planner Edward Veno, Edgartown Fire Chief Alex Shaeffer, and Edgartown Information Technology Director Adam Darack. Three others were AT&T consultants: site consultant Dan Bilezikian, structural engineer Marc Chretien, and radio frequency engineer Dan Goulet. Two others were expert witnesses: real estate appraiser George Valentine for AT&T, and radio telecommunications engineer David Maxson for Plaintiffs. The parties introduced 48 exhibits into evidence, many of them comprising several separate documents or photographs.
            After the final witness completed her testimony in December 2020, the parties submitted post-trial briefs or proposed findings of fact and rulings of law. After I reviewed those filings, I heard closing arguments on January 20, 2021.
Findings of Fact
            Based on all the credible evidence presented at trial, and all the reasonable inferences drawn from that evidence, I find the following facts.
            1.         The Parties and Their Properties
            Plaintiffs own a parcel of land at 307 Chappaquiddick Rd. in the Town of Edgartown, on the island of Chappaquiddick. Chappaquiddick Road is a paved public way. Plaintiffs’ parcel extends along Chappaquiddick Road from Enos Avenue to Sampson Avenue.
            Defendant Fynbo owns a parcel of land at 14 Sampson Ave. Sampson Avenue is a narrow unpaved road that begins at Chappaquiddick Road and proceeds approximately northeast for a short distance. The Fynbo parcel is on Sampson Avenue, four lots away from Chappaquiddick Road, and on the opposite side of Sampson Avenue from Plaintiffs’ parcel. Plaintiffs’ parcel and the Fynbo parcel are not directly opposite each other on Sampson Avenue.
 
                                                            -2-
 
            The physical relationship between the two properties can be seen on Exhibit PP,[5] a property map prepared for the Edgartown Town Assessor. On this map, Plaintiffs’ parcel is labeled as Lot 196.1, while Defendant Fynbo’s parcel is labeled as Lot 197. Exhibit UU also shows the physical relationship between the two properties. That exhibit, which resembles an aerial photograph, is actually a “visual representation . . . prepared by the landscape architect to show the current conditions,” according to Plaintiffs’ counsel. Transcript (“TR”) 4-23. On that exhibit, the boundaries of Plaintiffs’ parcel are outlined in white. The boundaries of Defendant Fynbo’s parcel are not directly outlined, but his house and an antenna are shown in the middle of a circle outlined in red and labeled “140 ft Radius.” (This exhibit misidentifies Sampson Avenue as “Eno’s Ave.” In fact, Enos Avenue is the unpaved road on the other side of Plaintiffs’ parcel, mislabeled on this Exhibit as “Cassandra’s Path.”) The boundaries of Defendant Fynbo’s parcel, and its relation to the Plaintiffs’ parcel, are shown clearly on a different tax assessor’s map found in a real estate appraiser’s report that AT&T submitted as part of its application.  See Exhibit D at PB 00631.
            Plaintiffs purchased their parcel in 2015. Plaintiffs also own a home in Natick. Plaintiff Dana Strayton owns a bakery in Bedford, where she works two or three days a week.
            Plaintiffs’ parcel contains three structures. One is the main house, located close to Enos Avenue. In the middle of the parcel is a barn. Closer to Sampson Avenue is a cottage, which Plaintiffs occasionally rent out, on either a long-term or a short-term basis. Plaintiffs also sometimes allow friends to stay in the cottage. When I took a view of the property, two friends of Plaintiffs were staying there.
 
---------------------------
 
[5]In a departure from the usual practice, the parties agreed that admitted exhibits would be designated by letters rather than numbers.
 
                                                            -3-
 
            The Edgartown zoning bylaw sets the minimum lot size for parcels in this neighborhood at three acres. Neither Plaintiffs’ parcel nor the parcel of Defendant Fynbo meets this requirement. Plaintiff’s parcel is 40,000 ft.², which is just under an acre. See Exhibit NN. It is undisputed that Defendant Fynbo’s lot is .55 acre.
            Defendant Fynbo has lived for decades in the house at 14 Sampson Ave. Since the late 1970s and continuing through the events at issue here, he operated a business at 14 Sampson Ave., individually and through Defendant MVWIFI, LLC. That business provided radio, TV, and local emergency services, and later provided high-speed wireless Internet, to Chappaquiddick residents who subscribed and paid for such services.
            To provide those services, Defendant Fynbo erected various structures at 14 Sampson Ave. When Plaintiffs purchased their property in 2015, the structure in place at 14 Sampson Ave. was an 84-foot guyed lattice-style tower (the “84-foot Tower”)[6] that Defendant Fynbo erected in 2010. The 84-foot Tower is shown in photographs found in Exhibits U and V. Shortly after purchasing their property, Plaintiffs became customers of Defendant Fynbo’s business for a brief time.
            2.         Earlier Town Efforts to Obtain or Improve Cell Phone Service on Chappaquiddick
            Since 2010 (and before, although the evidence at trial only briefly touched on earlier times), the Town of Edgartown has been anxious to provide reliable cell phone service on the island of Chappaquiddick. At that time, there was no cell phone tower on Chappaquiddick.
            The Town sought reliable cell phone service not only for the residents of Chappaquiddick, but for the many residents and visitors to Martha’s Vineyard who used
 
---------------------------
 
[6]In his testimony, Defendant Fynbo sometimes stated that this tower was 85 feet tall, and sometimes said it was 80 feet tall. Compare, e.g., TR 2-74, 2-115 (85 feet) with, e.g., TR 2-91 (80 feet). Plaintiff Dana Strayton referred to it as an 87-foot tower. TR 3-189.  However, I use the height listed in the MVC decision at issue here.  See Exhibit G at PB 02188. Whether this tower was 80 feet tall, 84 feet tall, 85 feet tall, or 87 feet tall is immaterial to my decision.
 
                                                            -4-
 
Chappaquiddick’s popular beaches during the summer. According to the credible testimony of Edgartown Fire Chief Alex Shaeffer, the Fire Department’s emergency medical services ambulances were regularly called to the beaches, and were always accompanied by the Edgartown Police Department to emergency calls. The lack of reliable cell phone service meant that people calling for help had to leave the beach to find a landline. Then the ambulance and police first responders had to communicate by landline with the caller who was no longer with the injured party, and with each other by using portable radios whose signals often did not reach across Chappaquiddick. Furthermore, once emergency medical technicians reached the scene of a medical emergency, either on the beach or at a home, the absence of cell phone coverage made it impossible for them to transmit medical information, such as electrocardiogram results, to physicians advising them from elsewhere on Martha’s Vineyard, or from the mainland.
            In approximately 2012, the Town reached an agreement with a company called Grain Management LLP, in which Grain agreed to provide cell phone service on Chappaquiddick employing “distributed antenna system,” or DAS, technology. Rather than using a tower to communicate with cell phones, this technology uses many small antennas on existing telephone poles. To implement this contract, Grain needed to find a cell phone carrier that would install and operate such a DAS system. Grain was unable to do so.
            Next, the Town put together a request for proposals (“RFP”) to provide telecommunication services on Chappaquiddick. The RFP did not specify the type of technology to be used, nor did it specify any particular sites. The Town’s idea was to let bidders in the telecommunications industry, who knew what was possible and what was desirable, submit proposals specifying a technology that bidders would actually implement if their bid was chosen.
 
                                                            -5-
 
            Early in 2015, the Town’s information technology manager Adam Darack, the primary drafter of the RFP, reviewed the bids, along with another Town employee. They decided to recommend to the Board of Selectmen a new bid submitted by Grain, to build a 165-foot cell phone tower on Town-owned property on Litchfield Avenue. The Selectmen invited public comment on this proposal. The reaction was voluminous, and generally negative. Chief among the reasons cited by citizens who opposed the project were the height of the tower and the use of Town-owned land for this purpose.
            The Selectmen decided not to accept the Grain bid (or any other bid). Instead, in June 2015 the Selectmen appointed a group of citizens to a Chappaquiddick Cell Committee. This Committee’s task was to find a workable solution for cell phone coverage on Chappaquiddick, and to locate a cell phone carrier willing to implement that solution. The Committee was particularly interested in finding a solution that would provide cell phone coverage in the neighborhood where Plaintiffs and Mr. Fynbo live, which is the most densely populated part of Chappaquiddick, although “densely populated” is a relative term on such a lightly populated island. Also important to the Committee was cell phone coverage on Chappaquiddick’s many beaches, some of them remote.
            The Chappaquiddick Cell Committee consulted with Verizon about the use of DAS technology, but Verizon ultimately demurred. The Committee explored the interest of Defendant AT&T in a tower solution, and a team from AT&T looked at many properties in Chappaquiddick, including the Town-owned Litchfield Road site. After touring the island, AT&T expressed preliminary interest in 14 Sampson Ave. and in a site on Pocha Road, which AT&T tentatively believed would be the best locations to provide the coverage for which the Town was aiming.
 
                                                            -6-
 
            The Chappaquiddick Cell Committee was anxious to obtain a temporary solution in time for the 2016 summer beach season. At its suggestion, AT&T identified six possible locations (the Pocha Road site, four parcels of Town-owned land, and 14 Sampson Ave.) where AT&T could place a temporary tower while pursuing a permanent solution. AT&T concluded that the only feasible alternative that could address the Chappaquiddick coverage issues by the summer of 2016 was a 104-foot tall, freestanding tower at 14 Sampson Ave. The Chappaquiddick Cell Committee unanimously recommended this temporary tower, and, after the MVC approved the tower with conditions, the Edgartown Planning Board issued a special permit authorizing it.
AT&T installed that temporary tower in 2016.
            3.         AT&T’s Efforts to Site and Design Its Tower
            AT&T then set out to find a permanent solution. To identify potential sites, AT&T employed the services of a site acquisition consulting firm, SAI Communications. That firm first laid out a “search ring,” covering the geographical area that potentially could provide the coverage sought by AT&T and the Town. Then the consulting firm identified every parcel within and just outside that search ring, a total of 425 parcels.
            To narrow this list of sites, SAI first eliminated Town-owned properties. AT&T and its consultant made this cut because the Town declined AT&T’s requests that it issue requests for proposals for bids to lease Town-owned parcels for the purpose of constructing a tower. SAI also eliminated conservation land, because of difficulties arising from land-use restrictions and expected citizen opposition. SAI looked at the remaining parcels with regard to lot size, ease of construction, and other site-specific factors. Site acquisition consultant Daniel Bilezikian of SAI credibly testified that this “very rigorous” site selection process was the most comprehensive
 
                                                            -7-
 
analysis of alternative sites he had ever performed in his 18 years of cell phone tower site analyses. This analysis revealed 56 properties that potentially might be suitable for a tower.
            As part of this analysis, another consulting firm, C Squared Systems, analyzed the extent of radiofrequency coverage (“RF coverage”), that is, the geographic area from which cell phones could connect to the tower and the strength of the signal when they did so. Daniel Goulet, a very experienced radiofrequency engineer at C Squared who performed the RF coverage analysis for AT&T, testified credibly that, when analyzing alternative sites for a cell phone tower, his firm was usually asked to perform RF coverage analyses for three or four sites. In this case, though, Mr. Goulet was first asked to run analyses for all 425 parcels identified by SAI in its search ring. Before he could complete those analyses, he was instructed to limit the analyses to 56 sites that survived SAI’s filtering process. C Squared produced what Mr. Goulet called “predictions” on the RF coverage for those 56 candidates. TR 3-38.
            AT&T contacted the owners of all 56 parcels about their interest in negotiating a lease option with AT&T. Only two owners expressed interest. AT&T negotiated lease options with those two owners, for their parcels at 14 Jeremiah Road and 2 Majane Lane, each of which was about 0.6 mile from 14 Sampson Ave. In addition, AT&T’s temporary tower lease with Defendant Fynbo gave it a contractual right to extend that lease and to construct a permanent tower at 14 Sampson Ave., if that was the option AT&T chose.
            AT&T’s RF coverage consultant C Squared prepared maps showing the geographic areas that would be served by the three potential cell tower locations, on Jeremiah Road, Majane Lane, and Sampson Avenue. Those three maps are found at pages PB 00801-803 in Exhibit D. In a written report that was ultimately included in AT&T’s application to the Planning Board, C Squared engineer Goulet explained that, in the green areas on these maps, signal strength would
 
                                                            -8-
 
provide “reliable indoor coverage, high data rates and enhanced customer experience.” Exhibit D at PB 00798. The three maps show a larger green area (that is, wider in-home geographic coverage) for a cell tower at 14 Sampson Ave. than for either of the other two potential sites. Mr. Goulet credibly testified to the same effect.
            Mr. Goulet also wrote that the Majane Lane site would provide “much weaker signals” in the “targeted area defined by Chappaquiddick, Pocha, and Dike Roads, where many of the permanent residents are located,” and would serve 10.1% fewer residences than a cell tower at Sampson Avenue. Exhibit D at PB 00799. Similarly, the Jeremiah Road site would cover 11.2% fewer residences than the Sampson Avenue location, and would also provide “much weaker signal levels to the residential neighborhoods within the Chappaquiddick, Pocha, and Dike Road area referenced earlier.” Id. In the professional opinion of Mr. Goulet, “by providing the most reliable coverage for the greatest number of residents, as well as providing coverage to areas of public concern such as the beaches, the Facility at 14 Sampson Ave. best meets AT&T’s coverage needs.” Id.  Plaintiffs presented no RF coverage testimony at trial to contradict what Mr. Goulet had to say. I find Mr. Goulet’s testimony, and his written report that I quote here, to be credible.
            This analysis by Mr. Goulet concerned the strength and reach of radiofrequency signals inside residences. The expert testimony and reports in the record were not as clear that the Sampson Avenue location would provide a broader range and stronger signals than the Majane Lane and Jeremiah Road locations when it came to outdoor use (including on beaches) and in- vehicle use of cell phones on Chappaquiddick.
            AT&T and its consultants also believed that the 14 Sampson Ave. site had other advantages over the sites on Majane Lane and Jeremiah Road. There had long been a tower on
 
                                                            -9-
 
14 Sampson Ave.; first the Fynbo 84-Foor Tower and then the AT&T temporary 104-foot tower. As a result, use of that site would require relatively little infrastructure work, such as forest clearing, connecting the tower to a power source, and connecting the tower into AT&T’s existing ethernet network. In addition, AT&T feared that building a tower at either of the other two sites might inspire opposition from neighbors who had not become accustomed to having a tower nearby – and, in fact, the owner of the Majane Lane property did face opposition from his neighbors to a possible tower on his property when his option agreement with AT&T became public knowledge. The Sampson Avenue neighbors were used to having towers, albeit shorter ones, on that site for many years, and AT&T hoped that this would lessen neighborhood opposition – although this lawsuit demonstrates that this hope was in vain, at least as to one neighboring family.
            As for infrastructure work, the Majane Lane site would have required that a quarter-acre be cleared of trees. The driveway that served the house there would have to be widened slightly, and relocated slightly as well because it encroached on a neighboring parcel that AT&T would have no right to use. To connect a tower on that property to its existing ethernet network, AT&T would have to install 1,500 feet of either telephone poles and overhead wires, or trenching and conduits. In addition, the nearest power source, a transformer that might or might not prove adequate to serve the tower, was 200 feet away, and would also have to be connected to the Tower.
            A Jeremiah Road tower would be closer to the road, but still would require tree clearing for the footprint of the tower and the access road. There was a connection to the ethernet at the northeast corner of the Jeremiah Road property, but trenching or overhead wires would be
 
                                                            -10-
 
required to connect the tower at that location. The nearest power source was a transformer about 400 feet away, and so more trenching would be required for that connection.
            AT&T decided to file an application for permission to build a 115-foot tower at 14 Sampson Ave. AT&T selected the 115-foot height based on advice from its RF coverage consultant that this height would give it the coverage it sought.
            Cell phone carriers sometimes create “stealth” towers, which attempt to disguise the tower as a flagpole or a tree, for example. However, AT&T decided on a standard tower design because the equipment needed to provide 4G coverage, and future 5G coverage, would not fit inside a stealth tower, especially because AT&T was required by its site lease to accommodate the equipment of Defendant Fynbo/MVWIFI (because its site lease with Mr. Fynbo contemplated that the 84-Foot Tower would be dismantled, with his equipment being moved to the Tower).
            The Tower was designed to comply with all industry-accepted design standards that are referenced in the Massachusetts Building Code. Among other things, those standards require a tower on Chappaquiddick to withstand 120 mile per hour winds. The Tower meets that requirement with an additional safety margin. Should the Tower nonetheless be overcome by wind, most likely it would bend rather than simply falling over. AT&T’s structural engineering consultant, Marc Chretien of Advance Engineering Group, credibly testified that none of the 300 towers he has designed during his career (200 of them in Massachusetts) has ever collapsed in a windstorm. The only home within 115 feet of the Tower (that is, in the zone where the Tower might fall even if it were knocked completely over, rather than bending, in a hurricane) is the Fynbo home on the same property. No part of Plaintiff’s parcel is within 115 feet of the Tower.
 
                                                            -11-
 
            Plaintiffs’ expert witness David Maxson testified at trial that the siting of the Tower at 14 Sampson Ave. did not properly account for dangers in the Tower’s “fall zone,” the area near a cell phone tower into which the tower itself might fall, or the “drop zone,” into which ice or objects could conceivably fall from the tower. I decline to credit this opinion, for several reasons.
            First, the Massachusetts State Building Code imposes no requirements about fall zones or drop zones of cell phone towers. Second, some Towns, including Edgartown, have adopted “Personal Wireless Service Facilities” zoning bylaws that cover cell phone towers, and some of those municipal bylaws elsewhere incorporate requirements concerning the fall zone or the drop zone – but the Edgartown bylaw does not. Third, and most tellingly, Mr. Maxson conceded that he provided expert consulting services to Edgartown when it drafted the current form of the Edgartown Personal Wireless Service Facilities bylaw, which imposes no fall zone or drop zone requirements. Finally, it is undisputed that no part of Plaintiffs’ property is within either the fall zone or the drop zone of the Tower.
            4.         Impacts of the Tower on Plaintiffs and Their Property
            In her trial testimony, Plaintiff Dana Strayton made clear her position that the primary negative impact from the Tower is its effect on the view from Plaintiffs’ property. See, e.g., TR 4-17 to 4-18. Specifically, Ms. Strayton testified that the Tower could be seen from the guest cottage and from the back door of the main house.
            As more fully described below, AT&T erected the Tower after obtaining all the necessary permits. As a result, I have the advantage of actually having observed the Tower from the Strayton property at trial, during the view. Based on that view, I find that the top of the tower is visible above the trees when one looks out the kitchen window of the guest cottage, and, a little
 
                                                            -12-
 
less obviously, from the dining room window of that cottage. The Tower can also be seen from certain outdoor locations on the Sampson Avenue side of the Strayton parcel. The Tower can be seen from Chappaquiddick Road if one stands at its intersection with Sampson Avenue and looks up Sampson Avenue, although the Tower is far less visible, and often invisible, from other locations on Chappaquiddick Road, including in front of the Strayton parcel.
            I cannot make a finding that the Tower is visible from the back door of the main house on the Strayton parcel, because Plaintiffs did not suggest during the view that I look for the Tower from that vantage point. In fact, I was not invited to look for the Tower from anywhere in, or even near, the Strayton home, which is on the far side of their parcel from Sampson Avenue (and therefore from the Tower). From photographs in evidence, I find that the back door of the Strayton home opens onto a back deck. Ms. Strayton testified that the view of the Tower from that vantage point interferes with her enjoyment of her morning cup of coffee on that deck.  I was not asked to visit that deck during the view, so I can make no finding about the impact of the Tower, if any, on the view from that deck.
            There are many photos in evidence, submitted both by Plaintiffs and Defendants, that show views of the Tower, or lack of views, from various places on the Strayton parcel. The photographic evidence does not change my findings, laid out above, about the locations on the Strayton property and on Chappaquiddick Road from which the Tower is visible.
            The Tower is 31 feet taller than the 84-foot Tower located at 14 Sampson Ave. when Plaintiffs bought their property. Although there was little trial evidence about the visibility of the 84-foot Tower, I find that, as a general matter, a 115-foot tower can be seen from more locations than an 84-foot tower. The absence of other evidence concerning the visibility of the 84-foot Tower makes it impossible for me to make any more specific findings about the added
 
                                                            -13-
 
visual impact of the Tower on Plaintiffs’ property as compared to the pre-existing view of the 84-foot Tower.
            In her deposition testimony in October 2019, nearly two years after the MVC decision at issue here, Ms. Strayton testified that Plaintiffs were then planning a renovation of their property that would involve “[a] garage, a pond, a renovation to the main house.” Exhibit GG at 45. At that time she did not explicitly mention any plans for removing trees. At trial, however, Ms. Strayton testified that Plaintiffs “plan on clearing all the trees” from their property. TR 4-20. These future plans are illustrated in a rendering prepared by Plaintiffs’ landscape architect, which resembles, but is not, an aerial photograph. See Exhibit VV. This rendering shows that only a few trees will remain, when compared to current conditions shown in a different architect’s rendering. See Exhibit UU.
            I find that any tree removal is not imminent, because, while Plaintiffs have consulted with an architect about their planned renovations, they have not undertaken any work. Indeed, Plaintiffs have no timeline for any renovations, which are intended to prepare the property for when Plaintiffs retire there. While Plaintiffs apparently do plan to remove many trees, I can make no finding about how much the view would change as a result, given the hypothetical nature, and lack of detailed evidence, on this topic.
            Another possible Tower impact on Plaintiffs might be its effect on their property values – or, more precisely, the effect on their property values of having a 115-foot tower, as opposed to an 84-foot tower, nearby. The only evidence on this question was presented by AT&T, in the form of testimony from appraiser George Valentine. Mr. Valentine’s first written impact study is also in the record, as part of the application AT&T submitted to the Edgartown Planning Board and, through that Board, to the MVC. See Exhibit D at PB 00622-648.
 
                                                            -14-
 
            In his trial testimony, Mr. Valentine was frank about the difficulty in reaching an opinion because of the scarcity of real estate sales on Chappaquiddick near 14 Sampson Ave., or
elsewhere on Martha’s Vineyard near other cell phone towers. Nonetheless, Mr. Valentine’s report, and his trial testimony, analyzed real estate transactions occurring near several other cell phone towers on Martha’s Vineyard. Most useful, Mr. Valentine testified, was a comparison of sales prices for a property at 15 Sampson Ave. before the erection of the 104-foot temporary tower in 2016, and a nearby property on Pamela Way after that tower went up. (Pamela Way is the next road over from Sampson Avenue; some of its properties back up to and abut properties on Sampson Avenue, including Defendant Fynbo’s property. See Exhibit D at PB 00631.) These two homes were roughly comparable, Mr. Valentine testified, and the second sale, after installation of the 104-foot temporary tower, was for 30% more than the first sale.
            Mr. Valentine’s report told the MVC of his professional opinion that the erection of the Tower “will not have any negative impact of the value of surrounding properties.” Id. at PB 00624. Mr. Valentine prepared follow-up impact reports after the MVC had issued its decision, which did not change this opinion. I find Mr. Valentine’s testimony, and this opinion, to be credible.
            Plaintiff Dana Strayton also testified that the erection of the Tower has made her unwilling to walk down Sampson Avenue past the Fynbo property, as was her custom when she went walking beforehand. In pre-Tower days, Ms. Strayton testified, her regular three-mile walk would take her up Sampson Avenue, around the neighborhood, and then back home via Enos Avenue, on the other side of her parcel. Now she just uses Enos Avenue for that walk in both directions. She avoids Sampson Avenue, she says, because she does not want to be looking up to see if something is going to fall off the Tower and injure her.
 
                                                            -15-
 
            Before the erection of the Tower, Ms. Strayton’s regular walking route took her past the 84-foot Tower that then stood at 14 Sampson Avenue. The Tower is only 31 feet taller than that earlier structure. For this reason, I do not entirely credit Ms. Strayton’s testimony about her fear of being struck by falling objects from the 115-foot Tower, when she felt no similar fear walking past an 84-foot structure. Furthermore, I find that Ms. Strayton’s decision to change the route of her regular walk imposes no serious impact on her, because the one- or two-block section of Sampson Avenue that she now avoids, from Chappaquiddick Road to E. Cape Poge Ave., is only approximately 900 feet long, or so I scale it on the aerial photograph that is Exhibit HH. Thus, her decision to begin her walk on the other side of her property, on Enos Avenue rather than Sampson Avenue, required her to modify only a very small percentage of her usual three-mile route. Finally, I find an extremely small likelihood of anything falling off the Tower at the very moment when Ms. Strayton is walking past. I find support for this finding in the undisputed evidence that neither the Massachusetts Building Code nor the Edgartown Personal Wireless Service Facilities bylaw imposes any requirements concerning the drop zone of a cell phone tower.
            5.         The MVC Hearing and Decision
            To erect the Tower, AT&T needed a special permit from the Edgartown Planning Board. AT&T filed a special permit application on June 10, 2017. That application, which is Exhibit D, is about three inches thick.
            A 115-foot cell phone tower qualifies as a “Development of Regional Impact,” which required AT&T to obtain the approval of the MVC, as well the Edgartown Planning Board, before it could construct the Tower. The approval process began with AT&T’s special permit application to the Planning Board. As required by law, on July 20, 2017, the Planning Board
 
                                                            -16-
 
referred the application to the MVC, so that the MVC could evaluate the application taking an island-wide, rather than strictly municipal, point of view. If the MVC issued an approval, the Edgartown Planning Board could then decide whether to grant the Town’s approval, in the form of the special permit sought by AT&T.
            Following its usual practice, the MVC sought the input of its professional staff. Its staff prepared a report, which staff members updated more than once while the MVC was considering the application. Again following its usual practice, the MVC referred the application to its Land Use Planning Committee for comment. Then the MVC held a public hearing, receiving information and comments from AT&T and its consultants, and from members of the public, on October 5, November 2, and November 30, 2017. At the first of these sessions of the public hearing, an attorney representing Plaintiffs gave oral testimony. At the second session, a different lawyer representing Plaintiffs gave oral testimony, as did each Plaintiff. At the third session, both Plaintiffs again gave oral testimony. During the course of the public hearing, the MVC received letters from many interested citizens, including both Plaintiffs and from a Melissa Strayton, who, I infer, is a relative of Plaintiffs. In fact, Plaintiff Robert Strayton provided nine letters over the course of the public hearing, if I understand the MVC decision correctly on this point. See Exhibit G at PB 02190.
            The MVC closed its public hearing on November 30, 2017. Then, after further review by its Land Use Planning Committee, the MVC held a deliberative session on December 21, 2017, at which it voted to approve, with conditions, AT&T’s application under its Development of Regional Impact rules. The MVC later issued a written decision to that effect on January 11, 2018. I reserve discussion of the specifics of the MVC’s 10-page decision, which is Exhibit G, for the Rulings of Law section, below.
 
                                                            -17-
 
            After obtaining the approval of the MVC, AT&T returned to the Edgartown Planning Board to continue its special permit application process. The Planning Board ultimately issued a special permit with conditions, permitting AT&T to erect the Tower. Plaintiffs appealed that decision as well, this time to the Land Court, where that appeal is still pending.
            A third appeal arising from the same set of facts is also pending in the Land Court. Plaintiffs began that case by requesting that the Edgartown Building Inspector, presumably in his role as Edgartown’s zoning enforcement officer, order Defendant Fynbo to take down the earlier 84-foot Tower, on the theory that it was an illegal structure. The Building Inspector denied Plaintiffs’ request. Plaintiffs appealed his decision to the Edgartown Zoning Board of Appeals, which affirmed the decision of the Building Inspector, apparently deciding that the 84-foot Tower was a legal structure.  Plaintiffs have appealed that decision to the Land Court as well, and it is still pending there.
            Plaintiffs made the MVC aware of their position that the 84-foot Tower was illegal by a letter from their attorney dated December 18, 2017, after the MVC closed its public hearing but three days before it voted to approve AT&T’s application to construct the Tower. In their letter informing the MVC of their legal position, Plaintiffs asked the MVC to delay making its decision until after a resolution of their position that the 84-foot Tower was illegal. The MVC declined that request.
            After obtaining its special permit from the Edgartown Planning Board, AT&T constructed the Tower. AT&T has been providing cell phone service to residents and visitors to Chappaquiddick through the use of Tower for approximately two years.
 
                                                            -18-
 
Rulings of Law
            1.         The Law That Governs MVC Review of a Cell Tower Application
            The responsibilities and powers of the MVC are set out in the Martha’s Vineyard Commission Act, Chapter 831 of the Acts of 1977 (the “MVC Act”). The MVC Act in its current form (that is, including one amendment in 1979) is Exhibit I.
            The MVC Act created the MVC as a regional land-use planning entity. The MVC Act instructs the MVC to
protect the health, safety and general welfare of island residents and visitors by preserving and conserving for the enjoyment of present and future generations the unique natural, historical, ecological, scientific, and cultural values of Martha’s Vineyard which contribute to public enjoyment, inspiration and scientific study, by protecting those values from development and uses which would impair them, and by promoting the enhancement of sound local economies.
MVC Act § 1.
            One way in which the MVC carries out this purpose is by ruling on applications to construct projects that, “because of their magnitude or the magnitude of their effect on the surrounding environment, are likely to present development issues significant to more than one municipality.” MVC Act § 12. Such projects are called Developments of Regional Impact. A cell phone tower higher than 35 feet qualifies as a Development of Regional Impact.
            If any town board on Martha’s Vineyard receives an application to construct a Development of Regional Impact, it must refer the application to the MVC. MVC Act § 13. The MVC then analyzes the application through its regional planning lens, including by holding a public hearing. The MVC can deny the application, or approve it with or without conditions. If the MVC issues an approval, the municipal board where the application originated is then free to decide whether to issue the relevant municipal approval. MVC Act § 14.
 
                                                            -19-
 
            The MVC Act instructs the MVC to consider, among other things, whether the probable benefit of the proposed development will exceed the probable detriment. MVC Act § 14(a). In making that determination, the MVC is to consider eight factors. MVC Act § 15. Plaintiffs focus their fire on the first factor: whether “development at the proposed location is or is not essential or especially appropriate in view of the available alternatives on the island of Martha’s Vineyard.” MVC Act § 15(a).
            The MVC Act provides for judicial review of MVC decisions. On appeal, “The court shall hear all pertinent evidence and shall annul the determination of the [MVC] if it finds that said determination is unsupported by the evidence or exceeds the authority of the [MVC], or it may remand the case for further action by the [MVC] or may make such other decree as is just and equitable.” MVC Act § 18. This standard of review harkens back to the statutorily- mandated procedure for court review of decisions of a municipal zoning board in M.G.L. c. 40A, § 17. Noting the similarity, the Appeals Court has looked to Chapter 40A zoning appeal cases for guidance in considering an appeal of a Superior Court decision under the MVC Act. Tisbury Fuel Serv., Inc. v. Martha’s Vineyard Comm’n, 68 Mass. App. Ct. 773, 774-776 (2007).
            2.         Plaintiffs’ Standing to Bring This Appeal
            Defendants AT&T and Fynbo/MVWIFI argue that I should not reach the merits of the MVC’s decision because these Plaintiffs lacks standing to challenge it, for reasons both legal and factual. First, as a matter of statutory interpretation, Plaintiffs do not qualify as “aggrieved parties” statutorily imbued with the power to file an appeal, say these Defendants. Second, even if the MVC Act permits them to appeal, Plaintiffs are not “aggrieved” as a matter of fact, as a plaintiff must be in any zoning appeal. If these Defendants are correct, then this court cannot hear this appeal, because Plaintiffs’ standing is a jurisdictional requirement. See Kenner v.
 
                                                            -20-
 
Zoning Bd. of Appeals of Chatham, 459 Mass. 115, 125 (2011) (plaintiffs bringing a zoning appeal based on alleged adverse impacts on their view “did not have standing to obtain judicial review of the board’s decision. . . .As such, the Land Court lacked subject matter jurisdiction” over the appeal of the special permit obtained by the defendants from a municipal board).
                        a.         Interpretation of the Phrase “Party Aggrieved”
            I will first consider these Defendants’ attack as a matter of law on Plaintiffs’ standing. The MVC Act authorizes an appeal by an “any party aggrieved.” MVC Act § 18. This language is not identical to the standing requirement for a Chapter 40A zoning appeal, which grants standing to an “aggrieved person.” M.G.L. c. 40A, § 17.  Defendants AT&T and Fynbo/MVWIFI argue that Plaintiffs, while they indisputably are “persons,” were not “parties” to the MVC proceedings, and therefore cannot be “part[ies] aggrieved” who have standing to bring this appeal.
            The MVC Act does not define “party aggrieved,” or even “party.” No appellate court has considered the meaning of “party aggrieved” in the MVC Act. In an unpublished decision in 2004, a judge of this court interpreted “party aggrieved” under the MVC Act as narrower than “aggrieved person” under Chapter 40A. Bilzerian v. Martha’s Vineyard Commission, Dukes Superior Court, Civil Action No. 2003-00041 (July 7, 2004) (Chin, J.). The same question has arisen twice in trial courts with regard to identical language in the Cape Cod Commission Act, with the Superior Court and the Land Court reaching opposite conclusions in unpublished decisions. See Watts v. Cape Cod Commission, Barnstable Superior Court, Civil Action No. 2002-00691 (Apr. 3, 2003) (Moses, J.); Botsini-Prime, LLC v. Cape Cod Commission, 19 LCR 611 (Land Ct. Dec. 21, 2011) (Piper, J.). None of these decisions are binding authority, and so I choose to analyze the question independently.
 
                                                            -21-
 
            The MVC Act requires the MVC to hold a public hearing when it considers a Development of Regional Impact. MVC Act § 14. Thus, the Legislature created an avenue for members of the public to comment on a proposal being considered by the MVC, and these Plaintiffs did so, at some length. Defendants AT&T and Fynbo/MVWIFI have pointed me to no provision of the MVC Act that explains how a member of the public can be designated as a “party” to the MVC’s proceedings, and I have found none. Yet they now argue that Plaintiffs should be penalized for failing to establish “party” status at the MVC when the statute does not provide a mechanism for achieving such status.
            It may be no accident that Defendant MVC, the party most familiar with the operation of the MVC Act, does not join its fellow Defendants in arguing that Plaintiffs cannot meet the statutory definition of “part[ies] aggrieved.” I rule that Plaintiffs are not prevented from filing this appeal because the MVC Act limits standing to “part[ies] aggrieved.”
                        b.         Impacts of the Tower on Plaintiffs
                                    i.          The Rebuttable Presumption of Standing
            Having ruled that Plaintiffs can qualify in theory as parties aggrieved, I now must consider whether they have standing to appeal the MVC’s decision as a matter of fact.
Following the lead of the Appeals Court in Tisbury Fuel Service, Inc., 68 Mass. App. Ct. at 774- 776, I will analyze that question by applying the test for standing in zoning cases under statutes such as M.G.L. c. 40A, § 17.
            Under Chapter 40A, a presumption of standing arises in favor of direct abutters to the subject property, as well as abutters to abutters within 300 feet of the property line. See, e.g., Watros v. Greater Lynn Mental Health & Retardation Ass’n, Inc., 421 Mass. 106, 110-111 (1995); Denneny v. Zoning Bd. of Appeals of Seekonk, 59 Mass. App. Ct. 208, 212 (2003).
 
                                                            -22-
 
Plaintiffs’ parcel does not abut that of Defendant Fynbo. Plaintiffs argue in their post-trial brief that Defendants have conceded that Plaintiffs enjoy the presumption, apparently as abutters to abutters within 300 feet. Plaintiffs’ Post-Trial Memorandum of Law at 33. Defendant AT&T states in its post-trial filing that “[t]he parties tried the case on the assumption that Plaintiffs are abutters to abutters within 300 feet of the Site . . . and therefore have a rebuttable presumption of standing.” Defendant [AT&T’s] Proposed Findings of Fact and Conclusions of Law at 18 n.14. Therefore, despite the dearth of evidence on this subject, I will assume that Plaintiffs begin with a presumption of standing.
            “If standing is challenged, and evidence is offered in support of such challenge, the jurisdictional question will be decided on ‘all the evidence with no benefit to the plaintiffs from the presumption’ of aggrievement.” Kenner, 459 Mass. at 118, quoting Marotta v. Board of Appeals of Revere, 336 Mass. 199, 204 (1957). “Once the presumption is rebutted, the burden rests with the plaintiff to prove standing.” Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20, 33 (2006). Defendants have presented evidence sufficient to rebut the presumption of standing.
            Assuming for the moment that view impacts can support standing, a question I will further address below, Defendants have presented evidence that the 84-foot Tower already occupied the Fynbo parcel when Plaintiffs purchased their parcel. Defendants have also introduced photographs showing that the Tower cannot be seen, or is not intrusive, from various places on Plaintiffs’ parcel.  (Plaintiffs introduced photographs showing greater visual impacts on portions of their property, but, at the standing stage of the analysis, the question is not which evidence is more credible or powerful, but only whether Defendants have introduced evidence on the question.) In introducing this evidence, Defendants followed the successful recipe of the
 
                                                            -23-
 
project proponent in Kenner, who presented evidence comparing the new structure and the structure it replaced, and photographs showing various perspectives from both properties, causing the Supreme Judicial Court to rule that the defendant had rebutted the presumption that plaintiffs had standing based on view impacts. See 459 Mass. at 119-120.
            As to Plaintiffs’ property value, Defendants have introduced expert testimony that the Tower will not negatively affect those values. As to the danger of the Tower collapsing or dropping objects, defendants have presented evidence that neither the Massachusetts Building Code nor the Edgartown Zoning Bylaw consider this danger to be serious to impose safety requirements, and that, in any event, no falling object, including the Tower itself, could reach Plaintiff’s parcel.
            Because evidence introduced by Defendants has rebutted Plaintiffs’ presumption of standing, I will consider the evidence concerning standing without giving Plaintiffs the benefit of the presumption.
                                    ii.         View Impacts
            To be entitled to standing, Plaintiffs must establish “that the injury flowing from the board’s action is special and different from the injury the action will cause the community at large.” Butler v. Waltham, 63 Mass. App. Ct. 435, 440 (2005), citing Bell v. Zoning Bd. of Appeals of Gloucester, 429 Mass. 551, 554 (1999) (other citations omitted). Plaintiffs must “establish [this] by direct facts and not by speculative personal opinion.” Standerwick, 447 Mass. at 33.
            In arguing that they will suffer a “special and different” injury, Plaintiffs rely heavily on the effect of the Tower on the view from their property. They face a legal obstacle to this argument, however. “Generally speaking, concerns about the visual impact of a proposed
 
                                                            -24-
 
structure on the abutting property are insufficient to confer standing.” Kenner, 459 Mass. at 120. For that reason, in Denneny, 59 Mass. App. Ct. at 213, the Appeals Court held that the plaintiff’s concern about “aesthetic deterioration” from construction of 135-foot cell phone tower was insufficient to confer standing on the plaintiff.
            A neighbor can assert view impacts as a basis for standing only if the bylaw or statute being applied specifically protects the view from the plaintiff’s property. See, e.g., Martin v. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 434 Mass. 141, 146 (2001) (abutter had standing concerning visual impact of church steeple because municipal bylaw required consideration of “[v]iews from public ways and developed properties”); Monks v. Zoning Bd. of Appeals of Plymouth, 37 Mass. App. Ct. 685, 688 (1994) (“the plaintiffs’ expressed concern with the visual impact might be dismissed as an aesthetic sensitivity insufficient to impart standing were it not for the specific provisions of the Plymouth zoning bylaw” requiring a finding that a proposed structure “will not in any way detract from the visual character or quality of the adjacent buildings, the neighborhood, or the town as a whole”).
            Plaintiffs argue for standing based on MVC Act § 1, which instructs the MVC to preserve and enhance “unique natural, historical, ecological, scientific, cultural, and other values” of the island of Martha’s Vineyard. Elsewhere, the MVC Act requires the MVC to consider the effect of a Development of Regional Impact on “other persons and property,” and whether that effect “is likely to be greater than is ordinarily associated with the development of the types proposed.” MVC Act § 15(c). Neither of these provisions, nor any other in the MVC Act cited to me, specifically mentions the protection of views. And general language of this type is common in zoning bylaws, but courts have never ruled such generalities sufficient to support the standing of neighbors based on view impacts.
 
                                                            -25-
 
            Even assuming that a neighbor’s concern about “aesthetic deterioration” from construction of a cell phone tower is “specific and personal” to the neighbor, “such a subjective concern is beyond the scope of interests protected by the Zoning Act.” Denneny, 59 Mass. App. Ct. at 213. Similarly, Plaintiffs have not pointed to any specific legislative intent, anywhere in the MVC Act, to protect their views. Therefore, I rule that Plaintiffs’ concern about the view from their parcel is beyond the scope of the interests protected by the MVC Act. Thus, as a matter of law, any adverse impact of the Tower on Plaintiffs’ view does not confer standing on them, and therefore does not confer jurisdiction on this court, to hear their appeal of a decision of the MVC.
            Even if view impacts could support standing here, that would not change the result. At this stage in the analysis, where I have considered all the trial evidence about the impact of the Tower on views from Plaintiffs’ property, “Standing essentially becomes a question of fact for the judge.” Kenner, 459 Mass. at 119. In my Findings of Fact, I have found that the Tower is visible from certain spots on Plaintiffs’ property, including from the windows on one side of their guest cottage. Plaintiffs failed to establish, however, that the Tower is so visible from the house in which they reside (which is on the far side of their parcel from Sampson Avenue) as to have a substantial adverse effect on them. Nor does Plaintiffs’ argument account for the pre- existing visual impact of the 84-foot Tower already in place when they purchased their parcel.
            Nor can Plaintiffs be heard to argue that the Tower will have a more dramatic adverse effect on their views after they carry out their plan to chop down most or all of the trees on their own property sometime in the future. Any such adverse effect on their views would be self-inflicted. Furthermore, the evidence about Plaintiffs’ future clearcutting was so hypothetical that I am unable to make any Findings of Fact about view impacts that would result.
 
                                                            -26-
 
            I have considered the evidence presented by all parties concerning the impact of the Tower on Plaintiffs’ view. Based on my Findings of Fact concerning that evidence, I rule that Plaintiffs have failed to carry their burden to establish, “by direct facts and not by speculative personal opinion,” Standerwick, 447 Mass. at 33, an “adverse effect . . . substantial enough to constitute actual aggrievement,” Kenner, 459 Mass. at 122.
                                    iii.        Other Impacts
            Plaintiffs argue that the possibility that the Tower might fall, or objects might fall from the Tower, constitutes an adverse effect sufficient to provide them with standing. I have found, however, that even if the Tower should topple over toward Plaintiff’s parcel – rather than buckling, as is more likely according to the only expert testimony on the subject – it would not reach Plaintiffs’ lot.
            A falling Tower could reach Sampson Avenue, however, as might objects or ice falling from the Tower. For that reason, Plaintiff Dana Strayton testified, she now fears walking down Sampson Avenue, and thus she has been forced to modify her usual walking route. Plaintiffs also argue in their post-trial filing that Ms. Strayton’s fear of walking down Sampson Avenue has caused her to forfeit a property right, on the theory that the Derelict Fee Statute, M.G.L. c. 183, § 58, gives her an easement to travel over Sampson Avenue. However, Ms. Strayton did not testify to any reluctance in bygone days to walking down Sampson Avenue past the 84-foot Tower. Furthermore, I have found as a matter of fact that the danger of falling objects, or a falling Tower, is so remote that neither the Massachusetts Building Code nor the Edgartown Personal Wireless Service Facilities zoning bylaw imposes any requirements to ameliorate that danger – even though Plaintiffs’ own expert witness advised Edgartown when it was drafting its bylaw. Finally, assuming the truthfulness of Ms. Strayton’s testimony that she has modified her
 
                                                            -27-
 
usual walking route to avoid Sampson Avenue, that modification has affected only a short portion of what she described as a three-mile walk. In summary, Plaintiffs’ evidence is speculation rather than fact, and any adverse effect is not substantial enough to constitute actual aggrievement. Therefore, I rule that Plaintiffs cannot base standing on possible adverse impacts of a falling Tower, or objects or ice falling from the Tower.
            Plaintiffs also contend that the erection of the Tower harms their property values, thereby conferring standing upon them. As the Supreme Judicial Court noted in its most recent zoning standing decision, “It is well-established, however, that diminution in value itself is not an interest protected” by zoning laws. Murchison v. Zoning Bd. of Appeals of Sherborn, 485 Mass. 209, 216 (2020), citing Kenner, 459 Mass. at 123.
            Plaintiffs might nonetheless be able to assert this basis for standing if they had proved a diminution in property value “related to cognizable interests protected by” the MVC. Murchison, 485 Mass. at 216, quoting Standerwick, 447 Mass. at 31-32. However, Plaintiffs failed to prove that their property is less valuable as a result of the erection of the Tower. As in Murchison, the credible testimony about property value in today’s case – indeed, the only testimony about property value in today’s case – came from an expert witness who opined that the Tower would have no negative impact on Plaintiffs’ property value.
            Another basis for standing asserted by Plaintiffs did not reach trial. In pretrial proceedings, I agreed with Defendants that Plaintiffs would not be permitted to introduce evidence at trial concerning the possibility that radiofrequency emissions from the Tower might adversely affect medical equipment used by plaintiff Robert Strayton. I based this ruling on Section 704 of the Telecommunications Act of 1996, a federal law that prohibits state or local governments from regulating cell phone towers “on the basis of environmental effects of radio
 
                                                            -28-
 
frequency emissions to the extent that such facilities comply with the [Federal Communications] Commission’s regulations concerning such emissions.” 47 U.S.C. § 332(c)(7)(B)(iv). Plaintiffs do not argue that the Tower is noncompliant with the FCC’s regulations concerning radiofrequency emissions. This federal preemption concerning the effects of radiofrequency omissions prevents the MVC, and this court, from considering Plaintiffs’ argument that health impacts from such emissions could provide them with standing. See AT&T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 431 n.6 (4th Cir. 1998); Hill v. Lebrun, 12 LCR 46, 48 (Land Ct. 2004) (Scheier, C.J.) (under federal law, health impacts were “beyond the scope of the Board’s consideration due to the provisions of the [Telecommunications Act],” and so under Massachusetts law the plaintiffs were “precluded from relying on health concerns to establish their standing”).
            In summary, none of Plaintiffs’ asserted bases for standing carries the day. I rule, therefore, that Plaintiffs had no standing to bring this appeal, and therefore this court has no jurisdiction to hear it.
            3.         The Merits of Plaintiffs’ Appeal
            Having reached that conclusion about standing, I could end the analysis at this point. Nevertheless, in case an appellate court should disagree about standing, I will briefly consider the merits.
            The MVC Act requires that the “court shall hear all pertinent evidence and shall annul the determination of the [MVC] if it finds that said determination is unsupported by the evidence or exceeds the authority of the [MVC].” MVC Act § 18. The “unique form of judicial review applicable peculiarly to zoning cases,” and made applicable here to an appeal of an MVC decision, requires that “the court find[] the facts de novo and measure[] the legal sufficiency of
 
                                                            -29-
the [MVC] decision against the court’s findings of fact rather than against those found by the [MVC].” Tisbury Fuel Serv., 68 Mass. App. Ct. at 776, quoting Green v. Board of Appeals of Provincetown, 26 Mass. App. Ct. 469, 473 n.6 (1988).  The court then must affirm the decision of the MVC unless it finds that the MVC decision “was ‘based on a legally untenable ground, or unreasonable, whimsical, capricious or arbitrary.’” Tisbury Fuel Serv., 68 Mass. App. Ct. at 776, quoting MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970).
            In Tisbury Fuel Service, as in today’s case, the plaintiff’s primary argument was that the MVC had acted unreasonably in weighing the probable detriment of the proposed project against its probable benefits. Tisbury Fuel Serv., 68 Mass. App. Ct. at 777. Based on the de novo findings of the Superior Court trial judge, both the trial judge and the Appeals Court evaluated the probable benefits and detriments of the proposed project, see MVC Act § 14(a), to determine whether the MVC had acted unreasonably or in an arbitrary and capricious manner, id. I will take the same approach here.
            The Tower provides considerable benefit to residents of Martha’s Vineyard, by providing them with reliable cell phone and related services. The Tower provides further benefits to both residents and visitors to Chappaquiddick by improving greatly the ability of Edgartown’s Police and Fire Departments (including emergency medical technicians) to provide their services on Chappaquiddick’s beaches as well as in its homes.
            Plaintiffs do not dispute these benefits. See Plaintiffs’ Post-Trial Brief at 10. Instead, they fault the MVC for failing to consider whether “development at the proposed location is or is not essential or especially appropriate in view of the available alternatives on the island of Martha’s Vineyard.” MVC Act § 15(a).
 
                                                            -30-
 
            AT&T’s application to the MVC, and the trial testimony of its site acquisition consultant, described a very thorough search for alternative locations. In its application, AT&T described why it had settled on three possibilities, namely Sampson Avenue, Majane Lane, and Jeremiah Road. AT&T then described why it regarded Sampson Avenue as the preferred alternative.
            In its decision, the MVC specifically found that the proposed development at the Sampson Avenue location “is appropriate in view of the available alternatives.” Exhibit G at 5 (emphasis in original). The MVC provided reasons for favoring the Sampson Avenue site: there was “an existing communications tower for many years” on the site, and “the site offers extensive coverage to most of Chappaquiddick and parts of Edgartown.” Id.
            Although the MVC Act requires the MVC to consider whether a Development of Regional Impact is “appropriate in view of the available alternatives,” MVC Act § 15(a), the MVC said that, having decided that the Sampson Avenue site was appropriate, the MVC had not “specifically reviewed and considered” AT&T’s leases on the two alternative sites. Id. While this language is unfortunate, it is also not entirely accurate. In the very same paragraph, the MVC specifically pointed out that it had “received testimony that [AT&T] had leases on two alternative sites on Chappaquiddick.” Id. In fact, AT&T provided more than testimony on this point; its application contained a lengthy Alternatives Analysis. See Exhibit D at PB 00572-603. Moreover, the MVC’s staff report described the three alternative sites, specifically referring to the Alternatives Analysis contained in AT&T’s application. See Exhibit BB at 2. Finally, the MVC reported in its decision that it had considered “the information presented at the public hearing, including listening to all the testimony presented and reviewing all documents and correspondence submitted during the hearing and review period.” Exhibit G at 5. The two
 
                                                            -31-
 
alternative sites were the subject of testimony, documents, and correspondence presented to the MVC.
            The MVC’s decision in this regard, and its procedure in reaching that decision, was not “‘based on a legally untenable ground, or unreasonable, whimsical, capricious or arbitrary.’” Tisbury Fuel Serv., 68 Mass. App. Ct. at 776, quoting MacGibbon, 356 Mass. at 639.
Based on the facts as I have found them, I agree with the MVC that the Sampson Avenue site was appropriate, if for no other reason than it provided in-home coverage to more residents of Chappaquiddick than did either of the other two alternative sites where AT&T had the right to place a cell phone tower. Evidence that the three locations might have provided comparable coverage to cell phone users in automobiles and outdoors does not change this conclusion, because I have specifically found that the Sampson Avenue location provided superior coverage, both in terms of geographic reach and strength of signal, inside residences on Chappaquiddick. This is an important advantage of the Sampson Avenue site, because not all medical emergencies on Chappaquiddick occur outdoors on the beaches.
            For the sake of completeness, I will mention briefly another form of alternatives analysis that I ruled irrelevant before trial, thereby preventing Plaintiffs from introducing evidence about it. Plaintiffs contend that Town-owned land on Chappaquiddick provided alternative and preferable sites for a cell phone tower, and the MVC erred in failing to compare the Sampson Avenue location to those alternatives. As one example, Grain Management LLP had earlier proposed a 165-foot tower on Town-owned land on Litchfield Road. Plaintiffs argue that the First Circuit has stated that, under the federal Telecommunications Act, cellular applicants do not dictate the pool of available alternatives. See Amherst, N.H. v. Omnipoint Commc’ns Enters., 173 F.3d 9, 14 (1st Cir. 1999).
 
                                                            -32-
 
            But AT&T was not the party dictating the pool of available alternatives here. Plaintiffs forget that the Town turned down Grain Management’s Litchfield Road proposal, in part because of citizen opposition to using Town land for a cell phone tower. More to the point, during its analysis of alternative sites, AT&T requested that the Town make Town-owned sites “available” by issuing requests for proposals that could result in AT&T entering into leases for those sites, as AT&T did with the private landowners on Majane Lane and Jeremiah Road. The Town rebuffed AT&T’s request. Therefore AT&T was justified in not presenting the MVC with any alternative cell phone tower sites on Town-owned land.  And therefore the MVC was justified in declining to consider alternative sites that the landowner did not make available. Certainly the MVC could not have forced a cell phone tower on any landowner, municipal or private. As a result, no Town-owned site constituted an “available alternative[] on the island of Martha’s Vineyard,” MVC Act § 15(a), that the MVC could compare against the Sampson Avenue site.
            Plaintiffs point to a few alleged errors by the MVC on topics not focused on allegedly superior alternative locations. For example, Plaintiffs argue that the MVC should not have counted in favor of the Sampson Avenue location the fact that it had long been the site of the 84- Foot Tower. That structure was illegal, Plaintiffs contend. There are two answers to this criticism of the MVC.
            First, while the MVC proceedings were ongoing, Plaintiffs challenged the legality of the 84-foot Tower by asking the Edgartown Building Inspector to order it taken down as a violation of Edgartown’s zoning bylaw. Plaintiffs made the MVC aware of this legal challenge before the MVC made its decision, but the MVC declined to delay its proceedings – perhaps Plaintiffs’ real goal – for the years it would take that challenge to work its way through the Edgartown Zoning Board of Appeals and then the court system. As it turned out, both the Edgartown Building
 
                                                            -33-
 
Inspector and the Edgartown Zoning Board of Appeals found that the 84-foot Tower was a legal structure. Plaintiffs appealed that decision to the Land Court, where it is pending today.
            Second, even if Plaintiffs’ challenge to the legality of that structure had been successful, that would not change the result. I must uphold the action of the MVC if a rational basis for the decision exists that is supported by the record. See Davis v. Zoning Bd. of Chatham, 52 Mass. App. Ct. 349, 356 (2001). The existence of the 84-foot Tower, or for that matter the 105-foot temporary tower erected by AT&T for the summer of 2016 season, was hardly the only basis for the MVC’s decision. One other prominent basis was that the Tower would cure long-standing cell phone coverage gaps on Chappaquiddick, and public safety concerns arising from those gaps.
            Plaintiffs also complain that the MVC allowed the Tower to be erected in the most densely populated neighborhood on Chappaquiddick – again, “densely populated” being a relative term on this sparsely inhabited island. But both AT&T and the Town were anxious that radiofrequency signals reach the maximum number of residences on Chappaquiddick, and the MVC’s decision not to prohibit construction in this location was not whimsical or arbitrary, even if more people could see the Tower than would be true in many other places on Chappaquiddick.
            Because the Sampson Avenue parcel was undersized under current zoning, Plaintiffs argue that the MVC should have found it inconsistent with municipal development bylaws, a factor made relevant by MVC Act § 14(c). But the MVC was well aware that AT&T would need to obtain a special permit from the Edgartown Planning Board, and that one feature of the Planning Board’s proceedings was likely to be noncompliance with zoning requirements. It was not whimsical or arbitrary of the MVC to decline to elevate zoning nonconformance over all
 
                                                            -34-
 
other factors, when the MVC knew that the municipality itself would be directly considering any such inconsistency.
            Plaintiffs argue that the MVC should have prohibited the Tower because AT&T could not disguise it as a flagpole or a tree. AT&T did consider the use of stealth technology. However, because the Tower needed to accommodate AT&T equipment that could provide current 4G service and future 5G service, as well as the equipment located on Defendant Fynbo/MVWIFI’s to-be-dismantled 84-foot Tower, it was not whimsical or arbitrary of the MVC to accept these design constraints.
            Plaintiffs air other grievances, but I need go no further. The legislature has instructed the MVC to protect the health, safety, and general welfare of the residents of Martha’s Vineyard in general, by considering through an island-wide lens whether the detriments of a particular Development of Regional Impact outweigh its benefits. After doing that here, the MVC reached the following conclusion in its decision: “THE COMMISSION FINDS THAT THE PROBABLE BENEFITS OF THE PROPOSED DEVELOPMENT WILL EXCEED THE PROBABLE DETRIMENTS, AS EVALUATED IN LIGHT OF THE CONSIDERATIONS SET FORTH IN SECTION 14(a) OF THE [MVC] ACT.” Exhibit G at 5 (emphasis in original). In its 10-page decision, the MVC explained at length why it reached this conclusion.
            In reviewing the MVC’s decision, I must defer generally to the judgment of the MVC. See Wendy’s Old Fashioned Hamburgers of New York, Inc. v. Board of Appeals of Billerica, 454 Mass. 374, 381 (2009). I can overturn the MVC decision only if it “was ‘based on a legally untenable ground, or unreasonable, whimsical, capricious or arbitrary.’” Tisbury Fuel Serv., 68
 
                                                            -35-
 
Mass. App. Ct. at 776, quoting MacGibbon, 356 Mass. at 639. The facts I have found, based on the evidence at trial, provide no basis to overturn the MVC decision.
Order for Judgment
            Based on these Findings of Fact and Rulings of Law, JUDGMENT SHALL ENTER in favor of Defendants.
@/s/Paul D. Wilson, Justice of the Superior Court
@March 23, 2021
 
 
xxz